### Interstate Petroleum Company v. Farris, et al.

(Decided September 30, 1914.)

### Appeal from Knox Circuit Court.

1. Judgment—What Essential to Validity.—It is essential to the validity of a judgment that it be entered upon the order book of the court, and signed by the judge; an unsigned judgment is no judgment at all.

2. Appeal—Time of—Signing of Judgment.—Where a judgment was spread upon the order book more than two years before an appeal was taken but was not signed by the judge until a much later date, which was within two years from the time the appeal was granted, the appeal was granted within two years from the rendition of the judgment and will not be dismissed.

3. Deeds—Fraud of Grantor—Transfer for Valuable Consideration—When Creditors Cannot Attack.—Where a transfer is for a valuable consideration, creditors cannot attack it because of the fraudulent intent of the grantor, where the grantee neither had, (1) actual notice of such intent, nor (2) notice of any fact or facts calculated to put him on inquiry and which would lead to a discovery of such intent, nor (3) participated in the fraud.

BLACK, BLACK & OWENS for appellant.

J. M. ROBISON for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

For several years previous to November 26, 1903, the Interstate Petroleum Company had been engaged in the business of developing territory, and the production of crude oil in Knox County; and for that purpose it had acquired a number of leases of lands in that county.

In the fall of 1903 Frank Ritchey, of Richmond, Virginia, obtained an option from said company to buy its property. Ritchey had theretofore interested Swisher, Kirkland, Meade and other residents of West Virginia in the oil business, and proposed to sell them his option upon the property of the Interstate Petroleum Company. Accordingly, Swisher and Kirkland visited the oil property in Knox County for the purpose of inspecting it, and upon their return to West Virginia they and their associates, on November 26, 1903, agreed to buy the property of the Interstate Petroleum Company and also the property of the Atlantic & Pacific Oil Company (a similar company doing business in the same neighborhood) for $25,000.00. Of this sum, $5,000.00 represented the purchase price of the property of the Interstate Petroleum Company.

The West Virginia purchasers sent Hartley, their attorney, to Knox County, Kentucky, for the purpose of examining the title to the property; and upon his favorable report, the sale was completed by a formal conveyance dated December 6, 1903, by which the Interstate Petroleum Company at the direction of Kirkland and his associates, conveyed the property sold by it, to Francis P. Bent as a temporary title-holder, for the recited consideration of $800.00. The West Virginia purchasers then organized the Blue Grass Oil & Gas Company under the laws of West Virginia, for the purpose of taking over their property; and that corporation having been formed on December 9, 1903, Bent by his deed dated December 18, 1903, conveyed all of said property to the Blue Grass Oil & Gas Company for the recited consideration of $1.00. These conveyances were lodged for record in Knox County on December 18, 1903. Up to the time of the sale Bent had been the field manager of the Interstate Petroleum Company, and had assisted in making the sale to Swisher, Kirkland and their associates; and for that service the Interstate Petroleum Company paid him $2,000.00. After the sale had been

agreed upon, Bent contracted to represent Swisher and Kirkland and their associates, and their corporation the Blue Grass Oil & Gas Company, in Kentucky; and with that end in view, he was made the title-holder of the property until the corporation could be formed. Bent paid nothing whatever to the Interstate Petroleum Company or to the Atlantic & Pacific Oil Company; on the contrary, the entire purchase money was paid by Swisher, Kirkland and their associates, who afterwards formed the Blue Grass Oil & Gas Company. After the sale had been completed, the Blue Grass Oil & Gas Company took possession of the property in December, 1903, and has held and operated it ever since.

On June 15, 1903, the Interstate Petroleum Company, being indebted to the appellees, Farris & Blair, in the sum of $500.00, had executed its note to that firm for $500.00, payable on December 15, 1903. The note was not paid at maturity; and, in the meantime, as above recited, the Interstate Petroleum Company had sold its property to the Blue Grass Oil & Gas Company.

On January 12, 1905—about 13 months after . the Interstate Petroleum Company had sold its property—Farris & Blair brought this action against the Interstate Petroleum Company, the Blue Grass Oil & Gas Company, and F. P. Bent, to recover the amount due on the note; and charging that the conveyances from the Interstate Petroleum Company to Bent, and from Bent to the Blue Grass Oil & Gas Company, were fraudulently made for the purpose of preventing the plaintiffs from collecting their debt, they procured an attachment which was levied upon the property the Interstate Petroleum Company had conveyed to the Blue Grass Oil & Gas Company.

Upon final hearing, the attachment was sustained, and Farris & Blair were thereby given a lien for their debt upon the property above mentioned; and from that judgment the Blue Grass Oil & Gas Company, the Interstate Petroleum Company and Francis P. Bent, prosecute this appeal.

1. Preliminary to the consideration of the case upon its merits, it becomes necessary to pass upon appellees' motion to dismiss the appeal upon the ground that it was not taken within two years after the judgment was entered. The appeal was taken before the clerk of this court on June 30, 1913. The judgment was spread upon.

the judgment book of the Knox Circuit Court on January 5, 1907, while Hon. H. C. Faulkner was the presiding judge of that court. By inadvertence, Judge Faulkner failed to sign the judgment book, a fact which was not discovered until some time in 1912, and after Hon. F. D. Sampson had become judge of said court. Judge Sampson, doubting his authority to sign the judgment book, refrained from doing so until after the decision of this court in Farris v. Matthews on September 25, 1912. (149 Ky., 455.) Upon his attention having been called to that decision, Judge Sampson signed the judgment book on November 21, 1912. The question for decision, therefore, upon the motion to dismiss the appeal, is this: Was the judgment appealed from rendered on January 5, 1907, when it was spread upon the judgment book, or on November 21, 1912, when it was signed by the presiding judge? If the first date is to control, the appeal is not in time; but if the judgment be treated as having been entered on November 21, 1912, the appeal was taken within time, and the motion should be overruled.

In speaking of the judgment now before us, the court, in Farris v. Matthews, *supra,* said:

"It is well settled that it is essential to the validity of a judgment that it shall be entered upon the order book of the court, and signed by a judge, and that an unsigned judgment is no judgment at all. Commonwealth v. Chambers, 1 J. J. Marsh., 108; Raymond, &c. v. Smith, 1 Met., 65; Johnson v. Commonwealth, 80 Ky., 377; Ewell v. Jackson, 129 Ky., 214."

The question must, therefore, be treated as closed by the opinion above referred to; and as there was no judgment until it was signed by Judge Sampson on November 21, 1912, the appeal was taken in due time, and the motion to dismiss the appeal is overruled.

2. Upon the merits of the case the chancellor was of opinion that the Interstate Petroleum Company sold its property for the purpose of defrauding its creditors; that Bent was the agent of that company and aware of its purpose; that in carrying out this scheme the organizers of the Blue Grass Oil & Gas Company agreed with the Interstate Petroleum Company to have the property conveyed to Bent so that he could hold the title and manage the property pending the organization of the new company, and for both companies; and in this way, ac-

cording to the written opinion of the chancellor, the Blue Grass Oil & Gas Company and its promoters received the title thus fraudulently conveyed, and both corporations were chargeable with the knowledge which their agent, Bent, had in the transactions.

It is sought to sustain this action under section 1906 of the Kentucky Statutes, which reads as follows:

"Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, or right or thing in action, or any rent or profit thereof, made with the intent to delay, hinder or defraud creditors, purchasers or other persons, and every bond, or other evidence of debt given, action commenced, or judgment suffered, with like intent, shall be void, as against such creditors, purchasers and other persons. This section shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor."

In order to bring the conveyance within the statute, the intent to delay, hinder or defraud creditors must actuate both parties to the transaction; or, if actuating the grantor only, the grantee must have had notice or knowledge of such intent upon the part of the grantor. An innocent purchaser for a valuable consideration and without notice of the fraud, will be protected, although the conveyance to him was made by the grantor with a fraudulent intent.

The general rule is announced in Wait on Fraudulent Conveyances, section 199, as follows:

"Generally speaking, to render a conveyance fraudulent and voidable as against creditors, there must have been mutuality of participation in the fraudulent intent, on the part of both the vendor and the purchaser. In discussing this subject, Chief Justice Church used these words: 'Nor is the vendor's fraudulent intent sufficient, the vendee must also be implicated.' "

In 20 Cyc., 465, the rule is announced as follows:

"If a transfer is for a valuable consideration, creditors cannot attack it because of the fraudulent intent of the grantor, where the grantee neither had (1) actual notice of such intent, nor (2) notice of any fact or facts calculated to put him on inquiry and which would lead to a discovery of such intent, nor (3) participated in the fraud."

The principle above stated has been recognized and applied by this court in a long line of cases; it is only necessary to refer to a few of them. Violett v. Violett, 2 Dana, 323; Thompson v. Sanders' Heirs, 6 J. J. M., 104; Brown v. Foree, 7 B. M., 358; Ratcliffe v. Trimble, 12 B. M., 32; Brown v. Smith, 7 B. M., 362; Beadles v. Miller, 9 Bush, 405; Summers v. Taylor, 80 Ky., 429; American Brewing Association v. McGruder, 17 Ky. L. R., 762, 32 S. W., 603; Pence v. Shackelford, 142 Ky., 10.

In American Brewing Association v. McGruder, *supra*, we said:

"On McGruder's part no motive whatever is suggested to induce him to have participated in a fraud, and that he took possession of the land and begun to expend considerable money on it is clearly shown. Ogden is a son-in-law of Hunt, but that he bought the notes and paid for them in good faith can hardly be doubted. It can not be contended that either of them knew of any intent on the part of Hunt to defraud his creditors, or had any reason to suspect such an intent."

Applying this rule to the facts of this case requires a reversal of the judgment. The chancellor rested his judgment upon the fact, which he found to be true, that Bent acted as the title-holder and intermediary between the Interstate Petroleum Company and the Blue Grass Oil & Gas Company, and agent for both companies pending the negotiations for the sale; and that his knowledge of the fraudulent intent of the Interstate Petroleum Company was by reason of the dual agency of Bent, notice to Kirkland and his associates and the Blue Grass Oil & Gas Company which they subsequently incorporated. The proof does not, however, sustain these findings of fact by the chancellor. Bent did not represent Kirkland or any of his associates in making the purchase; he represented the Interstate Petroleum Company alone in assisting in the sale, and was paid for his services by that company. After the sale had been made and Bent's connection with the Interstate Petroleum Company had ceased for the reason that the company had nothing for him to do, he entered the service of the Blue Grass Oil & Gas Company and its incorporators. But up to the time of the completion of the sale Bent's interest was adverse to that of Kirkland and his associates; and being adverse, Bent's knowledge of any fraudulent intent upon the part of the Interstate Petroleum Company could not be imputed to Kirkland and his associates.

Furthermore, we are not prepared to say that the evidence shows a fraudulent intent upon the part of the Interstate Petroleum Company in making this sale. The only evidence tending to sustain the view that such intent existed, is found in the testimony of Tiller, who was the nominal president of the Interstate Petroleum Company. That company was principally owned by stockholders who lived in New York, and who managed and controlled its operations entirely. While Tiller was nominally president, he was really nothing more than an executive officer residing in Kentucky. Tiller says he was not consulted about the sale; that the Interstate Petroleum Company received nothing from the sale; and in his opinion the sale was made for the purpose of defrauding the company's creditors. Tiller does not claim that he had any dealings with Swisher or Kirkland, or their associates, or anything whatever to do with the sale; his testimony is wholly negative in character and merely states his opinion upon that subject, rather than facts. He is clearly mistaken in stating that the Interstate Petroleum Company never received anything for this sale, since he not only knew nothing upon that subject, and was not in a position to know anything, but is expressly contradicted upon that question by at least five witnesses, and corroborated by none. Kirkland, Tague, Murphy, Keene and Meade, who were the officers and stockholders of the Blue Grass Oil & Gas Company, all testify that that company paid $25,000.00 for the properties of the Interstate Petroleum Company and the Atlantic & Pacific Oil Company; that $5,000.00 of that sum went to the Interstate Petroleum Company; and that in paying the purchase price, they paid $15,000.00 in cash, and executed the company's two notes for $5,000.00 each, one due in 60 days, and the other in 120 days, after December 18, 1903. There is no contradiction of this testimony.

Furthermore, the deferred payments of the purchase money were not paid until their maturity in February and April, 1904, and during all that time no one of the officers or stockholders of the Blue Grass Oil & Gas Company knew of the existence of the Farris note; and all of them testify that if they had had notice of the existence of such a note they would have paid it out of their purchase money. The Blue Grass Oil & Gas Company not only paid all of its purchase money in good faith and continued to spend money in developing its property,

but Farris waited for more than a year before he made any claim against that company with which he had never had any dealings.

A good deal of stress is laid upon the fact that the Interstate Petroleum Company conveyed the property to Bent and that Bent afterwards conveyed it to the Blue Grass Oil & Gas Company. We see nothing unusual in that procedure; on the contrary, it was the ordinary and legitimate method of transacting business of this character. Swisher and Kirkland and their associates all testify that they furnished the $25,000.00 purchase money; that Bent furnished none of it; and that they merely selected Bent as a title-holder, taking from him a paper to that effect, while they perfected the organization of the new corporation. We see nothing fraudulent in this transaction upon the part of the Blue Grass Oil & Gas Company, or its incorporators; on the contrary the proof shows they acted in good faith throughout these transactions and paid full value for the property; and that being true, they are in no way liable for the Farris debt, even though the purpose of the Interstate Petroleum Company in making the sale may not have been entirely above suspicion. The attachment against the property of the Blue Grass Oil & Gas Company should have been discharged.

Judgment reversed, with instructions to set aside so much of the judgment as sustains the attachment against the property of the Blue Grass Oil & Gas Company, and to dismiss the petition against it.