## McDonough, et al. v. McGowan.

(Decided June 15, 1915.)

### Appeal from Jefferson Circuit Court
### (Chancery Branch, No. 2).

1. Fraudulent Conveyances—Badges of Fraud—Effect of.—Where badges of fraud attend upon a conveyance which is attacked as fraudulent, their effect is to shift the burden of evidence, and the grantee must rebut the inferences thereby created and sustain the bona fides of the transaction.

2. Fraudulent Conveyances—Transfer Pending Action to Recover Damages for Tortious Act.—If a transfer is made by one against whom there is pending an action for tort, this is a badge of fraud, especially where the conveyance leaves the grantor without any estate.

3. Fraudulent Conveyances—Failure to Produce Available Explanatory Evidence.—It is the duty of the grantee in a conveyance attacked as fraudulent, when badges of fraud attend thereupon, to produce available explanatory and rebutting evidence; and the failure to do so will defeat the claim of bona fides of the transaction.

4. Fraudulent Conveyances—Effect of Grantee's Knowledge of Fraudulent Intent of Grantor.—Where the grantee has notice of the purpose of the grantor to cheat, hinder, delay or defraud his creditors or persons having claims against him, the grantee's title fails even though he be a purchaser for valuable consideration.

HENRY J. TILFORD for appellants.

J. W. S. CLEMENTS and JOSEPH J. HANCOCK for appellee.

OPINION OF THE COURT BY JUDGE HANNAH.—Affirming.

In February, 1912, Roger A. McDonough, while engaged in an affray with one Lee Moore, in M. J. O'Mally's saloon, in Louisville, shot and seriously wounded John W. McGowan, a bystander.

On April 8, 1912, McGowan instituted an action against McDonough to recover damages for his injuries, and obtained a judgment against him in the sum of one thousand dollars, the trial being had on March 10, 1913.

While this action was pending, on November 6, 1912, McDonough's mother died, leaving property of the value of about six thousand dollars. There were eight children to participate in the distribution of the estate.

Nine days after the death of his mother, on November 15, 1912, McDonough conveyed all his interest in the

estate—which was all the property he had—to his sister, Agnes T. McDonough.

McGowan attacked this conveyance, and sought to subject the interest in the estate so conveyed, to the payment of the judgment mentioned. The chancellor, upon trial, held the conveyance fraudulent; and the property having been sold in an action to settle the estate, directed the proceeds of the one-eighth interest so conveyed, to be paid to plaintiff, McGowan. The defendant, McDonough, and his sister, appeal.

The only testimony taken was the depositions of the appellants, taken by appellee as if under cross-examination. Counsel for appellants in his brief says, ''The chancellor dismissed all this testimony with the mere statement that it was beyond belief that the sister could have loaned the brother so much money;'' and claims that ''there is not such evidence as satisfies the mind to a reasonable degree that fraud has been committed,'' and that, therefore, the judgment should be reversed.

It was the contention of the appellant that McDonough conveyed to his sister, Agnes, his share in the estate of his mother, in consideration of certain loans made to him by his sister, as follows: $300.00 in March, 1908; $125.00 in June, 1910; $200.00 in February, 1912; and $78.50 in September, 1912.

The appellant, Agnes McDonough, testified that she graduated from Clark's Business School when she was about sixteen years of age, and about six months thereafter obtained work as a stenographer. She says this was about March, 1906; but elsewhere in her deposition she testified definitely that she was twenty-one years of age on August 5, 1912, so it is quite probable that she began work during 1907 rather than in 1906, for in March, 1906, she was but little more than fourteen and a half years of age. She received a salary of five dollars per week. She said that in March, 1908, she loaned to her brother, Roger, $300.00. At this time she could not have been working much longer than a year, during which time, as she admitted, out of her salary she bought all her own clothing and paid all her other expenses except board. The probability of her having such a sum at that time is, to say the least of it, quite questionable.

She further testified that after she ceased working as a stenographer in 1909, she remained at home with her mother, who made her an allowance of three dollars per

week, out of which she clothed herself and paid all her incidental expenses. She said that out of this allowance she saved $150.00 from 1909 to 1912, when her mother died; that she kept her money at home in a box; and when asked how much she had altogether, she replied "about nine hundred dollars." That she could not have had the possession of such a sum of money at that time is apparent. During the three years that she worked as a stenographer at five dollars per week, she received in all $780, and this added to the $150 saved out of the allowance her mother made her, would make $930.00; but this takes no account of her expenditures during six years for all her clothes and her incidental expenses, nor of the $300.00 which she says she loaned her brother in 1908, nor of the $125 which she says she loaned him in June, 1910, nor of the $200 loaned to him in February, 1912, and the $78.50 loaned to him in September, 1912. It is impossible for her to have had as much as $900.00 at any one time saved from her wages; yet such is her testimony. "Q. How much did you have altogether? A. Altogether I had about $900. Q. And you kept it right there in the house? A. I did." Furthermore, she said that after having made all these loans to her brother, she had about $100 or $125 remaining.

She further testified that her sister, Mrs. Bohmicke, was present when she loaned her brother the $300.00, and that her brother, Joe, was present when she made the loans of the $200, the $125, and the $78.50. When asked concerning the $125 loan, "Who else saw it?" she answered, "Only the family, that is all." She had two older sisters then residing at home. Neither the brother, Joe, nor the sisters mentioned, nor any of the other members of the family were produced to support her testimony in this respect.

She further admits that she knew of the shooting of appellee by her brother, Roger, and of the pendency of the action to recover damages therefor, and admitted that she knew that Roger had no means other than the expectation by way of inheritance of a portion of the estate of his mother; and she said it was her mother's intention to "cut Roger off" with a bequest of five dollars, "because she knew that he did not know how to take care of money."

Yet, despite this knowledge, she says she loaned him these, to her, large sums of money; and despite her busi-

ness training and experience, she took from him no note or other memorandum or evidence of indebtedness.

Roger testified that he borrowed from his sister, Agnes, the sums above mentioned. He said in regard to the $300.00 loan: "I asked mother for it and told her I would like to go in business, that I was in bad health; and mother said she didn't have it; and she (Agnes) said, 'I will loan it to you if you will pay it back,' and I said, 'If I ever get it, I will.'"

He said the plumbing business proved a failure and he lost that $300.00; and that the $125.00 which she loaned him in June, 1910, which he borrowed for "medical use" was used in paying Dr. Hamilton $15.00, and paying Dr. Jones "some," and Dr. Dwyer "some," and "some" was expended for medicine. He was unable to go into details.

As to the loan of $200.00 made in February, 1912, he said he paid a fine of $35.00 and an attorney fee of $50; and as to the remainder says: "I had to use the rest of it. Q. What for? A. I'll tell you if you want to know; McGowan and them asked for a drink, and I gave it to them. Q. Did that take the rest of it? A. No; I had to use the money to get around with, and spent it."

The $78.50 loan was expended in paying $15 on an attorney fee, and the remainder was partly accounted for by expenditures for "underwear and shirts," and by the fact that "A person has got to have a nickel or dime to spend among his friends." He admitted that when he borrowed this $78.50 that he told his sister that his attorney fee was $50, and that when he got the money he only paid $15 on it.

As we view this evidence, we think it very doubtful if McDonough's sister ever had these sums in her possession, and that if she did have them, it is very doubtful that she loaned them to him as claimed.

It is the well-settled rule that where badges of fraud attend upon a conveyance which is attacked as fraudulent, their effect is to shift to the grantee the burden of evidence, and he must rebut the inferences thereby created, and sustain the bona fide of the transaction. Magic City Coal & Feed Co. v. Lewis, 164 Ky., 454; Perry v. Krish, 157 Ky., 109, 162 S. W., 555; Stix v. Calender, 155 Ky., 806, 160 S. W., 514; 20 Cyc., 439.

If a transfer is made by one against whom there is pending an action for tort, this is a badge of fraud,

especially where the conveyance leaves the grantor without any estate. Floyd v. Martin, 4 R., 891 (before action instituted); Lillard v. McGee, 4 Bibb., 165; Hale v. Proffit, 160 Ky., 440, 169 S. W., 851; Commonwealth v. Filiatreau, 161 Ky., 434. And the conveyance herein attacked of all the property he owned, having been made while the action of appellee to recover damages for his wounds was pending, it was incumbent on the grantee to meet and overcome the inference created by that fact and the subsequent insolvency of the grantor.

Resting as appellants were under the burden so imposed, their failure to produce available explanatory and rebutting testimony from the lips of the other members of the family can only be accounted for upon the theory that if so produced as witnesses, they would have declined to lend support to the testimony of the appellants. If these transactions actually occurred, it is no violent assumption to say that all the members of the family residing at home were cognizant of the facts; indeed, appellants testified that at least one member of the family, if not more, was present upon the occasion of the making of each of these loans. And we might also remark that it is hardly within the bounds of reason that the considerable sum of money testified about by Agnes McDonough could have been kept about the house, especially in a drawer, as she stated, without the knowledge of other members of the family.

Because of the failure of appellants to produce this available testimony, we find it impossible to believe that such loans were in fact made, or that the conveyance herein attacked was based upon any real consideration passing between the parties. Appellants failed to sustain the *bona fides* of the transaction.

But, whether the conveyance was based upon a real consideration passed between the parties or not, still all the circumstances point unerringly to the conclusion that it was made with the fraudulent intent to cheat, hinder, delay and defraud appellee in the collection of whatever judgment he might obtain against Roger McDonough, and that the grantee, Agnes McDonough, had notice of such fraudulent intent; and, these things being true, even though she be a purchaser for a valuable consideration, her title fails. Summers v. Taylor, 80 Ky., 429; Carter v. Richardson, 60 S. W., 397, 22 R., 1204; Hoffman v. Leslie, 66 S. W., 822, 23 R., 1981; Walters v.

Akers; 101 S. W., 1179, 31 R., 259; Interstate Petroleum Co. v. Farris, 159 Ky., 820, 169 S. W., 535; Foster v. Griggsby, 1 Bush, 86 (transfer to creditor in payment of antecedent debt).

The judgment of the chancellor is, therefore, affirmed.